IN THE UNITED STATES DISTRICT COURT FILED
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

2016 APR 12 P 3: 57

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

**MICHAEL DUVAL**

**Fort Lauderdale, Florida 33334**

                            **Plaintiff,**

v.

**GLOBAL CRIMINAL JUSTICE
        SOLUTIONS, LLC**
**7900 Westpark Drive**
**Suite T220**
**McLean, Virginia 22102**

Civil Action No. 1:16CV409
JCC | JFA

**Serve Registered Agent:**

   **William B. Porter**
   **4020 University Drive**
   **Suite 300**
   **Fairfax, Virginia 22030**

                            **Defendant.**

## CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Michael Duval, by his undersigned counsel, complains of Defendant as follows:

### INTRODUCTION

1.      Plaintiff Michael Duval ("Duval") and Defendant Global Criminal Justice

Solutions, LLC ("GCJS") entered into a number of written contracts under which GCJS

promised to confer employment status and benefits associated with that status on Duval upon the

Department of State's Bureau of International Narcotics and Law Enforcement Affairs for

Criminal Justice Program Support awarding its contract to GCJS.

1

2.      Under these same written agreements, GCJS promised to pay Duval an annual salary valued at $225,000.

3.      In exchange for Defendant's promise, Duval promised to work as Program Manager on behalf of GCJS and devote substantially all of his time and effort to the benefit of GCJS.

4.      Duval performed services on behalf of GCJS as Program Manager from 2011 to December 31, 2014, and GCJS accepted Duval's services.

5.      Despite the personal assurances of its Managing Director, Eric Adolphe, GCJS failed to confer employment status or the associated benefits upon Duval after securing the CJPS contract and failed to compensate Duval as promised.

## PARTIES

6.      Plaintiff Michael Duval is, and at all relevant times has been, a resident of the State of Florida.  Virtually all of the work performed by Plaintiff for Defendant was performed in Plaintiff's home in Florida.

7.      At all times relevant to this action, Duval was party to a contract with Defendant Global Criminal Justice Solutions, LLC.

8.      Defendant Global Criminal Justice Solutions, LLC is a Virginia limited liability corporation with its principal place of business located at 7900 Westpark Drive Suite T220, McLean, Virginia 22102.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction pursuant to 28 U.S.C. §1332.  Defendant Global Criminal Justice Solutions, LLC regularly transacts business in the Commonwealth of Virginia,

2

is organized under the laws of the Commonwealth of Virginia and has its principal place of business in the Commonwealth of Virginia.

10.    Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. §1391(b).

## FACTUAL ALLEGATIONS

11.    GCJS contacted Michael Duval in April 2010 to act as a Deputy Program Manager for its potential contract with the U.S. Department of State ("DOS") Bureau of International Narcotics and Law Enforcement ("INL") Criminal Justice Program Support ("CJPS") Contract.

12.    At that time, Duval was an employee of another government contract in Indonesia.

13.    Duval returned to the United States from Indonesia in October 2010, after the end of that government contract.

14.    Duval returned to the United States for the sole purpose of the potential offer and Contingent Hire Agreement with GCJS.

15.    In October 2010, Duval signed GCJS's initial Contingent Hire Agreement with the contingency that the CJPS contract would be awarded to GCJS.

16.    This initial Contingent Hire Agreement did not have an expiration date.

17.    The initial Contingent Hire Agreement stated that Duval's salary would be $225,000 per year, if GCJS was awarded the CJPS contract.

18.    Duval held a previous contract position working for the U.S. Government in Indonesia at the time the first offer was made by GCJS.

19.     In Spring 2011, Duval was offered a senior security position with an Indonesian conglomerate, the Rajawali Group.

20.     Duval turned down the senior security position based upon the Contingent Hire Agreement Mr. Duval had executed with GCJS.

21.     Duval awaited the results of the GCJS June 8, 2011 proposal in connection with his future with GCJS.

22.     Until the time of the contract award, GCJS gave Duval a sub-contract with one of its joint venture participants, Federal Management Systems ("FMS"), dated November 16, 2010, to prepare for contract awards and other services required by FMS.

23.     The FMS consulting agreement compensated Mr. Duval at a rate of $125 per hour with a maximum of $10,000 per month.  The consulting agreement provided by FMS expired on January 16, 2011.

24.     On December 6, 2010, Department of State Contracting Officer Jamie Goewey requested that the GCJS proposal be extended through January 14, 2011.

25.     On January 4, 2011, Goewey asked that the proposal be extended through February 18, 2011.

26.     GCJS Managing Director Eric Adolphe acknowledged and accepted both requests.

27.     However, on February 15, 2011, GCJS received notice that it did not win the award for the master contracts of $10 billion over five years issued by DOS for CJPS.

28.     On February 28, 2011, GCJS filed a bid protest.

4

29.     In the protest, GCJS stated that the government made several errors in the evaluation of its proposal, including, *inter alia,* that GCJS had replaced the previously proposed Program Manager George Bohlinger with Duval in October 2010.

30.     The position of Program Manager in the CJPS "Request for Proposals" is a key personnel position and was evaluated by the DOS as part of the contract proposal evaluation process.

31.     In response to the protest, DOS's evaluation of the contract relied in part upon Duval as the Program Manager.

32.     According to the base contract, key personnel cannot be substituted for the first ninety days after award unless required by illness, death, or resignation.

33.     After replacing Mr. Bohlinger with Duval, GCJS never attempted to substitute someone other than Duval as Program Manager.

34.     On March 10, 2011, Goewey notified GCJS that DOS would take "corrective action" regarding the CJPS awards, resulting in the suspension of the previously submitted contracts, including those submitted by GCJS.

35.     DOS required confirmation that GCJS's proposal would "remain valid through May 10, 2011."

36.     Adolphe responded by extending the GCJS proposal through May 10, 2011.

37.     Because of the initial October 2010 Contingent Hire Agreement's failure to designate an expiration date, GCJS asked Duval to sign an updated Contingent Hire Agreement on March 10, 2011.

38.     This renewed agreement again restated Duval's position as Program Manager with an annual salary of $225,000.

39. The March 10, 2011 Contingent Hire Agreement stated its expiration as August 31, 2011.

40. In April 2011, GCJS issued a third Contingent Hire Agreement to Duval, altering his initial salary of $225,000 to $120,000.

41. Under this new Contingent Hire Agreement, $120,000 would be received as salary and the remaining $105,000 of the original $225,000 would be paid as a bonus.

42. The third Contingent Hire Agreement retained the August 31, 2011 expiration date from the March 10, 2011 Contingent Hire Agreement.

43. In an email exchange between Duval and Adolphe that began on July 16, 2011, Adolphe asked Duval about reducing Duval's equity stake in GCJS in order to obtain additional financing for GCJS.

44. Adolphe intended to divide and sell Duval's equity stake in order to obtain the additional financing.

45. Adolphe referred to an additional investment for Duval that Adolphe had previously increased from 3% to 5%.

46. Duval expressed concern that his base salary had been reduced to $120,000 per year and that he had yet to see any compensation for his loss in base salary in any bonuses, as stated in the April 2011 Contingent Hire Agreement.

47. Duval also inquired whether he would receive a separate contract indicating the compensation in bonuses and if this provision had been approved by the Compensation Committee. To benefit the joint venture participants and himself, and with the intent to defraud Plaintiff, Mr. Adolphe responded:

> Note the proposed agreement frees up cash from the JV members who otherwise
> would have to fund the start-up costs (almost 2 million) which directly impacts our

6

ability to cover pre-revenue salaries. Also, your employment agreement is secured at the agreed upon rate (I believe that it was $225K) There is no compensation committee review required.

48.     DOS awarded a contract to GCJS on June 7, 2011.

49.     GCJS signed the contract on June 8, 2011.

50.     The June award was later again protested on June 16, 2011, although the base year of the contract was in effect.

51.     Despite the protest, GCJS flew Duval to Washington, D.C. on June 30, 2011, for a kick-off meeting and to present Duval to GCJS joint venture participants as its Program Manager for the CJPS contract.

52.     During this meeting on June 30, 2011, the Contingent Hire Agreement had been activated based upon a number of emails between Duval and Adolphe, receipt of business cards stating that Duval was the Program Manager, receipt of a company credit card as the Program Manager, and Duval's being copied on emails as the Program Manager for the CJPS contract award.

53.     Duval also believed that the DOS contract required that the Program Manager presented in the proposal, be an employee of GCJS for a minimum of ninety days.

54.     In personal meetings with DOS Contracting Officer Terry Lord, Adolphe introduced Duval as the Program Manager.

55.     Beginning in June 2011, Duval performed the duties as Program Manager as a full-time employee on behalf of the GCJS; this status was continually confirmed by Adolphe and GCJS leadership.

56.     From the time of the initial contract award on June 7, 2011, Duval repeatedly asked Adolphe about "onboarding" as full-time employee.

7

57.     Adolphe gave Duval multiple excuses for delaying his employment, including but not limited to GCJS needing to initiate and activate its line of credit and that the contracting environment had changed and GCJS needed funds from GCJS joint venture participants.  These misrepresentations were made by Adolphe, in part, to secure financial benefits for himself and with the intent to defraud Plaintiff.

58.     Had Duval known or been told that GCJS would be unable and/or unwilling to pay him for the work he completed after GCJS obtained the CJPS contract, he would not have relied upon the terms of the Contingent Hire Agreements.

59.     On June 14, 2011, FMS extended its consulting agreement with Duval through June 30, 2011.

60.     On June 16, 2011, FMS extended its consulting agreement with Duval through July 31, 2011.

61.     On August 10, 2011, the FMS consulting agreement was extended to September 30, 2011.  No further extensions were made to the consulting agreement, although FMS continued to pay partial invoices.

62.     The Diplomatic Security Service scheduled a desk audit in order for the GCJS Facility to be considered as a secure facility, and the facility received its Clearance on August 11, 2011, which was required under the CJPS contract.

63.     Adolphe told Duval on August 8, 2011, that Duval needed to be in Washington, D.C. for the audit as he was "the only key person" required on the CJPS contract.

64.     Between the time period of August 2011 and April 2012, Duval continued to set up policy procedures including evacuation policies, policies regarding deaths of employees

working overseas, as well as working with onboarding subcontractors in order to develop the nascent capacities of GCJS.

65.     On April 26, 2012, DOS asked GCJS to confirm its submission of key personnel on the CJPS contract.

66.     On April 30, 2012, GCJS confirmed that it was resubmitting Mr. Duval and attached his résumé.

67.     On May 24, 2012, after the desk audit, the basic GCPS contract award was confirmed with minor modifications.

68.     From June 2011 through December 2014, GCJS represented to the U.S. government that Duval was its Program Manager.

69.     The U.S. government continued to believe Mr. Duval was acting as Program Manager until GCJS notified otherwise on or about December 8, 2014.

70.     From June 2011 through December 2014, GCJS and its joint venture participants used Mr. Duval's résumé for its proposal purposes.

71.     One of GCJS's joint venture participants, International Criminal Justice Solutions, submitted Mr. Duval's résumé as Program Manager in a proposal for a contract with the U.S. Department of Justice.

72.     Another of GCJS's joint venture participants, Centerscope Technologies, also submitted Duval's résumé for several proposals with the Department of Justice.

73.     Beginning in July of 2012 and extending through 2014, GCJS submitted a number of proposals to the U.S. Government under the master CJPS contract including proposals with the Haitian Police on July 17, 2012, Mexico Merida on August 23, 2013, Mexico Police Training on December 13, 2013, Palestinian Authority Security Forces on December 30, 2013, Mexico

Background Investigations on February 12, 2014, and Liberian National Police and Ministry of Justice on February 18, 2014.

74.     In all of these proposals, GCJS identified Duval as its Program Manager both in the submission letters and in technical proposals.

75.     In October 2013, Aubrey Stephenson, President of GCJS joint venture participant FMS, told Duval that Duval's consulting agreement with FMS may be suspended due to sequestration and a general slow-down in government work at FMS.

76.     In late 2013 and early 2014, Duval prepared GCJS proposals for Mexico Police Training submitted on December 13, 2013, for Palestinian Authority Security Forces on December 30, 2013, for Mexico Background Investigations on February 12, 2014, and for Liberian Police and Judicial Reform on February 18, 2014.

77.     At no point during this period did GCJS ever advise Duval that he was not, or would no longer be, its Program Manager.

78.     Duval continued to maintain daily contact with Adolphe and GCJS joint venture participants involving his performance and duties.

79.     In reliance, during this period, Duval did not seek employment elsewhere.

80.     In February 2014, Duval informed Adolphe that Duval believed the full-time position to begin at the date that GCJS was awarded the CJPS contract, and Duval also told Adolphe that the possibility of Duval exploring other opportunities should not be construed as a resignation or breach of the Contingent Hire Agreement.

81.     In response to Duval's email, Adolphe responded: "Understood and don't disagree with anything you say below. I did speak with American Systems about you and recommended you as a PM for their upcoming requirement."

82.     Duval contacted Adolphe in or about late March 2014 and explained that GCJS needed to compensate him as agreed.

83.     GCJS asked Duval to fly to Virginia for the CJPS Mexico III Task Order kick-off meeting.

84.     During this visit to Virginia on April 3, 2014, Duval met with Adolphe and other GCJS management.  Thereafter, Adolphe met in private with management and instructed Mr. Dougherty to verbally inform Plaintiff that GCJS would honor its promise to compensate Duval. As a result of these communications with, and representations from, GCJS, Duval believed that his GCJS non-payment issue had been resolved.

85.     On July 28, 2014, Duval sent an email to Adolphe informing Adolphe of his frustration involving his employment status and payment for the services that he had he continued to provide in reliance on the representations from GCJS.

86.     On August 27, 2014, Duval again sent an email to Adolphe and copied Stephenson and Dougherty.

87.     The email stated, in part: "It has been one month since I sent you the below email (of July 28th) and five months since our discussion about payments for my position as GCJS Program Manager.  I would appreciate the courtesy of a reply and an explanation as to the intent of the GCJS JV in honoring the contingent hire agreement."

88.     Duval did not receive a response to his August 27, 2014 email.

89.     Due to GCJS's failure to make payments to Duval as promised, Duval submitted his resignation on December 1, 2014 with the effective date of December 31, 2014.

90.     As a result of GCJS non-payment, Duval was forced to liquidate retirement and college savings accounts, thereby compromising the future value of each account and incurring early withdrawal penalties.

91.     As a joint venture with member participants that were not co-located, GCJS used a variety of methods to conduct business, including telephone, internet, dropbox CRC-In-Box, webex, Weboffice, Sharepoint and other cloud-based business management tools.  From Florida, Plaintiff conducted regular weekly meetings, developed Policies and Procedures for GCJS, recruited, received and reviewed resumes, conducted personnel interviews by phone with prospective candidates, wrote and edited Task Order Proposals, conducted official communications with all members of GCJS JV, US Government Officials and GCJS Sub-contractors, scanned, sent and received documents, telephoned US Government officials, GCJS members, partners and subcontractors, and maintained and developed a resource library for security, policing and international studies to be used in GCJS proposals.

92.     GCJS officially notified the U.S. Government on or about December 8, 2014 of Duval's resignation.

93.     As of March 25, 2016, Duval remained identified on the GCJS website as its Program Manager.  GCJS continues to utilize Duval's name, without consent, in the "Leadership" portion of its website in an effort to maintain its existing contractual relations, stabilize its business and assist in securing new contracts and/or business.  Including Duval in its "Leadership" portion of its website, GCJS states:

> Success begins with having the right leaders in place.  As an organization with a global footprint, GCJS brings together proven experts, access to thousands of advisors, and the requisite security controls, leadership, logistics, and Life and Mission Support capabilities necessary to initiate and sustain INL mission.

## COUNT I
### Breach of Contract

94.     Duval incorporates the allegations contained in all the foregoing paragraphs as though fully alleged herein.

95.     A number of written contracts existed between Duval and GCJS, wherein GCJS promised to make Michael Duval a full-time employee as Program Manager with eligibility for GCJS's employee benefits upon the Department of State's awarding the CJPS contract to GCJS.

96.     Under these contracts, GCJS also promised to pay Duval an annual salary of $225,000 per year.

97.     Duval promised to perform work on behalf of GCJS as Program Manager.

98.     GCJS failed to meet its obligations under its Contingent Hire Agreements once the U.S. government named it an awardee of the CJPS contract and GCJS subsequently accepted and signed the contract in June 2011.

99.     GCJS failed to give Duval employee status or any benefits normally obtained with that status, such as health insurance or a retirement plan, but instead provided a number of excuses as to the delay.

100.     Duval, by contrast, fully performed all of his obligations under those agreements.

101.     GCJS breached the Contingent Hire Agreement by failing to categorize and report Duval as a full-time employee and failing properly to pay him for the services he performed as Program Manager from June 8, 2011 until his resignation on December 31, 2014.

102.     As a result of the breach, Duval has suffered and will continue to suffer actual damages.

103.     In addition, as a direct and proximate result of the breach, Duval is, and has been, unable to secure employment due to unsettled issues created by GCJS.

13

## COUNT II
### Quantum Meruit

104.    Duval incorporates the allegations contained in all the foregoing paragraphs as though fully alleged herein.

105.    A number of agreements existed between Duval and GCJS.

106.    Under these agreements, GCJS promised to make Michael Duval a full-time employee as Program Manager with eligibility for GCJS's employee benefits upon the Department of State's awarding the CJPS contract to GCJS.

107.    Under these agreements, GCJS also promised to pay Duval an annual salary of $225,000 per year.

108.    GCJS failed to fulfill its promises under its Contingent Hire Agreements once the U.S. government named it an awardee of the CJPS contract and GCJS subsequently accepted and signed the contract in June 2011.

109.    GCJS failed to fulfill its promise to Duval when it failed to confer on Duval employee status or any benefits normally obtained with that status, such as health insurance or a retirement plan, but instead provided a number of excuses as to the delay.

110.    Duval nonetheless performed services for GCJS as promised but for which he was not paid.

111.    In performing services, Duval conferred a benefit upon GCJS.

112.    GCJS had knowledge of the benefit that Duval conferred upon it through his services.

113.    GCJS accepted the benefit that Duval conferred upon it.

114.    GCJS was unjustly enriched by its acceptance of Duval's services and its subsequent failure to fully pay Duval or confer employee status upon Duval.

14

115.    It would be inequitable for GCJS to retain the benefit conferred upon it by Duval without paying Duval fair value for the benefit it received.

## COUNT III
**Failure to Pay Wages/Claim for Attorney's Fees – Florida Statute Code Section 448.08**

116.    Duval incorporates the allegations contained in all the foregoing paragraphs as though fully alleged herein.

117.    GCJS promised to pay Duval an annual salary of $225,000.

118.    As set forth above, GCJS failed to pay Duval the wages as agreed.

119.    As a result, Duval has suffered actual damages, including expenditures for attorney's fees.

## COUNT IV
**Unauthorized Use of Name – Violation of Virginia Code Section 8.01-40**

120.    Duval incorporates the allegations contained in all the foregoing paragraphs as though fully alleged herein.

121.    By representing that Plaintiff remained as its Program manager after the employment relationship ended, and by continuing to do so, Defendant intentionally took, appropriated and/or used Plaintiff's name for its commercial and other benefits associated with Plaintiff's name in violation of Virginia Code Section 8.01-40.

122.    Defendant has benefitted from the use of Plaintiff's name after Defendant resigned.

123.    As a result of Defendant's violations, Duval has suffered actual damages.

## PRAYER FOR RELIEF

Based on the foregoing, Duval respectfully requests that this Court award him the following relief against Global Criminal Justice Solutions, LLC:

A. Under Count I, judgment against Global Criminal Justice Solutions, LLC in the amount directly attributable its breach of contract, including:

    i. The value of the salary promised to Duval by Global Criminal Justice Solutions, LLC ($225,000 per year) from June 2011 through December 31, 2014 in the amount of $777,500;

    ii. The value of the employee benefits promised to Duval by Global Criminal Justice Solutions, LLC, which it did not confer upon him, for the period from June 2011 until December 31, 2014;

    iii. Compensatory and consequential damages in the amount of $150,000;

    iv. Pre- and post-judgment interest as permitted by law; and

    v. All costs incurred by Duval as a result of Global Criminal Justice Solutions, LLC's breach.

B. Under Count II, judgment against Global Criminal Justice Solutions, LLC in the amount directly attributable to its breach of implied contract:

    i. The value of the salary promised to Duval by Global Criminal Justice Solutions, LLC ($225,000 per year) from June 2011 through December 31, 2014 in the amount of $777,500;

    ii. The value of the employee benefits promised to Duval by Global Criminal Justice Solutions, LLC, which it did not confer upon him, for the period from June 2011 until December 31, 2014;

    iii. Compensatory and consequential damages in the amount of $150,000;

    iv. Pre- and post-judgment interest as permitted by law; and

v.   All costs incurred by Duval as a result of Global Criminal Justice Solutions, LLC's breach.

C. Under Count III, judgment against Global Criminal Justice Solutions, LLC in the amount directly attributable to the failure to pay wages to Duval:

    i.   The value of the salary promised to Duval by Global Criminal Justice Solutions, LLC ($225,000 per year) from June 2011 through December 31, 2014 in the amount of $777,500;

    ii.   The value of the employee benefits promised to Duval by Global Criminal Justice Solutions, LLC, which it did not confer upon him, for the period from June 2011 until December 31, 2014;

    iii.   Reimbursement of all attorneys' fees;

    iv.   Pre- and post-judgment interest as permitted by law; and

    v.   All costs incurred by Duval as a result of Global Criminal Justice Solutions, LLC's breach.

D. Under Count IV, judgment against Defendant Global Criminal Justice Solutions, LLC for

    i.   compensatory damages in an amount totaling $100,000;

    ii.   punitive damages in an amount totaling $100,000;

    iii.   payment of all costs associated with this action; and

    iv.   Pre- and post-judgment interest as permitted by law.

E. Any other such relief that the Court may deem just and equitable.


## JURY DEMAND

Plaintiff demands a trial by jury to the maximum extent permitted by law.

Respectfully submitted,

By: _Susan L. Kruger_

Susan L. Kruger, Esquire (#25363)
Marc E. Pasekoff, Esquire (#77171)
Sara McDonough, Esquire (#86376)
Victoria Harrison, Esquire (#85893)
Alan Lescht and Associates, P.C.
1050 17th Street, N.W.
Suite 400
Washington, D.C. 20035
(202) 463-6036 (tel.)
(202) 463-6067 (fax)
susan.kruger@leschtlaw.com
marc.pasekoff@leschtlaw.com
sara.mcdonough@leschtlaw.com
victoria.harrison@leschtlaw.com
*Counsel for Plaintiff*

Dated: April 12, 2016

18